RECORD NO. 13-1849

In The

# United States Court of Appeals
### For The Fourth Circuit

## PAUL H. FELDMAN,

*Plaintiff – Appellant,*

**and**

**MARTIN L. PERRY,**

*Plaintiff,*

**v.**

## LAW ENFORCEMENT ASSOCIATES CORPORATION; ANTHONY RAND; JAMES J. LINDSAY; JOSEPH A. JORDAN; PAUL BRIGGS,

*Defendants – Appellees.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NORTH CAROLINA AT RALEIGH

————————

## BRIEF OF APPELLANT

————————

R. Scott Oswald
John T. Harrington, Jr.
EMPLOYMENT LAW GROUP, PC
888 17th Street, NW, Suite 900
Washington, DC  20006
(202) 261-2806

*Counsel for Appellant*

Michael C. Byrne
LAW OFFICES OF MICHAEL C. BYRNE, PC
Wachovia Capitol Center, Suite 1130
150 Fayetteville Street
Raleigh, North Carolina  27601
(919) 865-2572

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. ___13-1849___     Caption: <ins>PAUL H. FELDMAN, PLAINTIFF - APPELLANT AND MARTIN L. PERRY, PLAINTIFF v. LAW ENFORCEMENT ASSOCIATES CORPORATION; ANTHONY RAND; JAMES J. LINDSAY; JOSEPH A. JORDAN; PAUL BRIGGS</ins>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<ins>Paul Feldman</ins>
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
      (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?  ☐YES ☑NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _John T. Harrington_    Date: ___July 19, 2013___

Counsel for: _Paul Feldman, Appellant_

## CERTIFICATE OF SERVICE
**************************

I certify that on ___July 19, 2013___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Amy Y. Jenkins
Helen Hiser
McAngus, Goudelock & Courie, LLC
735 Johnnie Dodds Blvd, Suite 200
Mt. Pleasant, SC 29464

_John T. Harrington_                     ___July 19, 2013___
(signature)                                      (date)

# **TABLE OF CONTENTS**

Page

TABLE OF CONTENTS....................................................................................i

TABLE OF AUTHORITIES ...........................................................................v

STATEMENT OF JURISDICTION................................................................1

STATEMENT OF THE ISSUES.....................................................................1

STATEMENT OF THE CASE.........................................................................2

STATEMENT OF FACTS ...............................................................................3

    A. Carrington put Rand and Jordan on LEA's Board, and
       Rand chose Lindsay .............................................................................4

    B. Carrington had to step down from control of LEA after he
       was convicted of a felony involving illegal exports in 2005;
       but he involved LEA in possibly illegal exports through
       SAFE Source, a company he secretly owned.....................................4

    C. In September 2007, Feldman learned that Carrington
       planned to sell LEA; after the sale announcement, the
       Outside Directors clashed with Feldman over their efforts
       to protect Carrington's interests .......................................................5

    D. After the sale announcement, the Outside Directors reversed
       their votes in favor of employment contracts for Feldman and
       Perry because they did not want anything to upset Carrington's
       sale of LEA .........................................................................................6

    E. Finkelstein, on behalf of the Outside Directors, began drafting
       false minutes for LEA Board meetings; Feldman consistently
       objected ...............................................................................................7

    F. In late December 2007, and early 2008, Feldman reported to
       the Board that Carrington, through his secret ownership of

i

SAFE Source, had involved LEA in possibly illegal exports; and Feldman suspected that the Outside Directors then leaked his disclosure to Carrington ............................................................8

G. Feldman reported LEA's involvement with exports through SAFE Source to the federal government, and his report led to a criminal investigation; Feldman later asked the Outside Directors to affirm that they had not told Carrington about his disclosure; and the Outside Directors refused ...........................................9

H. Finkelstein presented invoices to LEA that Feldman refused to pay because he considered them fraudulent ...................................................10

I. The Outside Directors did not perform their duties as Audit Committee members, and LEA had to report to the SEC in 2008 that it had violated its Audit Committee charter and the rules of the American Stock Exchange by failing to meet in 2007 ...........................................................................................................10

J. After Feldman reported LEA's dealings with SAFE Source, the Outside Directors falsely claimed that Feldman failed to provide pre-meeting agendas and sufficient financial information; Feldman provided sufficient information and the Outside Directors did not review the information they received ...........................................................................................11

K. In 2008, Feldman moved LEA because it benefitted the company, and he had the authority to do it; and the Outside Directors opposed it only because they thought it would upset Carrington ...........................................................................................13

L. Before his firing, Feldman tried to negotiate a deal with Joseph and Barbara Wortley to avoid the consequences of an earlier deal, made by Carrington, with the Wortleys; and Feldman reported to LEA that Joe Wortley wanted the Outside Directors to resign ...............................................................................................14

M. LEA reported record income and sales just before it fired Feldman; LEA purportedly fired Feldman because he had disparaged the Outside Directors to Wortley ...............................................16

SUMMARY OF THE ARGUMENT .................................................................17

STANDARD OF REVIEW ......................................................................21

ARGUMENT ...........................................................................................22

I.   Feldman's protected conduct under SOX was a contributing
     factor; a contributing factor is any factor which, alone or in connection
     with other factors, tends to affect in any way
     the outcome of the decision ..........................................................23

II.  A contributing factor may be demonstrated by various types
     of direct and circumstantial evidence; temporal proximity is
     not required ..................................................................................23

     A. Deviations from policy are evidence of discriminatory
        motive ...................................................................................25

     B. A record of strong performance, and a record of criticism,
        may provide evidence of discriminatory motive ..................26

     C. Other evidence of retaliatory animus suffices where
        temporal proximity is lacking ............................................27

III. LEA failed to demonstrate by clear and convincing evidence
     that it would have taken the same adverse action in the
     absence of Feldman's protected conduct.......................................29

IV.  Feldman engaged in protected conduct under SOX; any
     doubt caused by the District Court's "assumptions" must be
     resolved in favor of Feldman ........................................................32

     A. Under *Sylvester*, which should be accorded *Chevron*
        deference, protected activity does not require explicit
        references to specific violations .........................................32

CONCLUSION.........................................................................................35

REQUEST FOR ORAL ARGUMENT ..................................................36

CERTIFICATE OF COMPLIANCE ........................................................................ 37

CERTIFICATE OF FILING AND SERVICE ........................................................ 38

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>Federal Cases</u>

*Addis v. Dep't of Labor*, No. 08-1009 (7th Cir. July 30, 2009)................................23

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)............................................22

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ........................................................22

*Chevron U.S.A., Inc. v. Natural Resources Defense
Council, Inc.*, 467 U.S. 837 (1984) .........................................................................33

*Collins v. Beazer Homes USA, Inc.*, 334 F. Supp. 2d 1365
(N.D. Ga. 2004)..................................................................................................... 29-30

*Edell & Assoc., P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d
424 (4th Cir. 2001)......................................................................................................22

*EEOC v. Mental Health Auth. of St. Mary's, Inc.*, 2008 WL
53254 (D. Md. 2008)............................................................................................... 27-28

*English v. General Elec. Co.*, 496 U.S. 72 (1990)...................................................22

*Felty v. Graves-Humphreys Co.*, 818 F.2d 1126 (4th Cir. 1987) ...........................21

*Grogan v. Garner*, 498 U.S. 279 (1991)..................................................................29

*Hawkins v. PepsiCo, Inc.*, 203 F.3d 274 (4th Cir. 2000).........................................31

*Jackson v. RKO Bottlers of Toledo, Inc.,* 743 F.2d 370
(6th Cir. 1984).............................................................................................................27

*Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173
(3d Cir. 1997)..............................................................................................................27

*Kansas Gas & Elec. Co. v. Brock*, 780 F.2d 1505 (10th Cir. 1985)........................22

*Lee v. N.M. State Univ. Bd. of Regents*, 102 F. Supp. 2d 1265 (D.N.M. 2000) ................................................................................ 25-26

*Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324 (10th Cir. 1996).....................................26

*McClam v. Norfolk Police Dept.*, 877 F.Supp. 277 (E.D.V.A. 1995) .....................25

*Medical Waste Assocs. v. Mayor & City Council of Balt.*, 966 F.2d 148 (4th Cir. 1992) .....................................................................21

*Miller v. Leathers*, 913 F.2d 1085 (4th Cir. 1990) ..................................................21

*Motor Club of Am. Ins. Co. v. Hanifi*, 145 F.3d 170 (4th Cir. 1998) ......................22

*NLRB v. Scrivener*, 405 U.S. 117 (1972) ...............................................................22

*Platone v. Dep't of Labor,* 548 F.3d 322 (4th Cir. 2008) .........................................32

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)...............................................................................................23

*Sussberg v. K-Mart Holding Corp.*, 463 F. Supp. 2d 704 (E.D. Mich. 2006) ..........................................................................................29

*Welch v. Chao*, 536 F.3d 269 (4th Cir. 2008).........................................................33

*Wiest v. Lynch*, 710 F.3d 121 (3d Cir. 2013)..........................................................33

*Woodson v. Scott Paper Co.*, 109 F.3d 913 (3d Cir. 1997) .....................................27

## <u>Administrative Cases</u>

*Duprey v. Fla. Power & Light Co.*, 2000- ERA-5 (ALJ July 13, 2000) .................29

*Halloum v. Intel Corp.*, 2003-SOX-7 (ALJ Mar. 4, 2004)………..........................23

*Jayco v. Ohio Envtl. Prot. Agency,* 1999-CAA-5 (ALJ Oct. 2, 2000) ...................26

*Nix v. NEHI-RC Bottling Co., Inc.,* 84-STA-1 (Sec'y July 13, 1984)....................25

*Overall v. TVA*, 97-ERA-53 (ARB April 30, 2001) .................................................26

*Peck v. Safe Air Int'l*, Inc., ARB No. 02-028 (ARB Jan. 30, 2004) .......................29

*Pillow v. Bechtel Constr., Inc.*, 87-ERA-35 (July 19, 1993) ...................................24

*Sylvester v. Parexel,* 2011 WL 2517148 (May 25, 2011) ................................. 32-34

*Timmons v. Mattingly Testing Servs.,* 95-ERA-40 (ARB June 21, 1996)..............23

*Wells v. Kansas Gas & Elec. Co.,* 83-ERA-12 (ALJ Feb. 27, 1984) ......................25

## **Federal Statutes**

Corporate and Criminal Fraud Accountability Act of 2002,
Title VIII of the Sarbanes-Oxley Act of 2002,
18 U.S.C. § 1514A (SOX). ........................................................................... 1, 32-34

28 U.S.C. § 1291 ........................................................................................................1

28 U.S.C. § 1331 ........................................................................................................1

## **Federal Regulations**

29 C.F.R. § 1980.104(c)............................................................................................29

## STATEMENT OF JURISDICTION

The United States District Court for the Eastern District of North Carolina (District Court) had subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331, as the claims arose under the laws of the United States, specifically the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A (SOX).

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 to hear this appeal from the District Court's final decision and order filed on June 27, 2013, granting the Appellees' motion for summary judgment. On July 5, 2013, a notice of appeal was timely filed with the Clerk of the District Court. This appeal is from a final judgment that disposes of all parties' claims.

## STATEMENT OF THE ISSUES

I.    Whether the District Court erred in determining that Feldman's protected conduct under SOX was not a contributing factor in LEA's decision to fire him, given that a contributing factor is any factor which, alone or in connection with other factors, tends to affect *in any way* the outcome of the decision, and where Feldman presented proof of animus towards his protected activity and other evidence of retaliatory motive, including deviations from policy, strong performance, and pretext.

II.    Whether the District Court, having erred in finding Feldman's

protected conduct was not a contributing factor, erred again in making no effort to

determine whether LEA met its burden, under SOX, to demonstrate by clear and

convincing evidence that it would have fired Feldman in the absence of his

protected behavior.

## STATEMENT OF THE CASE

Plaintiff and Appellant Paul Feldman, and Plaintiff Martin Perry, brought

this action against their former employer, LEA, and against individual defendants

Anthony Rand, James Lindsay, Joseph Jordan, and Paul Briggs (collectively,

Appellees). In his First Amended Civil Complaint, filed on June 7, 2010, Feldman

alleged whistleblower discrimination under the Sarbanes-Oxley Act of 2002

(SOX). Feldman, and Perry, also brought other claims. *See* Joint Appendix (JA)

at 17.

Appellees filed a motion to dismiss on June 21, 2010, and brought

counterclaims against Feldman and Perry. *See id.* at 71. The District Court, on

March 10, 2011, granted the motion in part and denied it in part. The District

Court also granted a motion to dismiss filed by another defendant, John

Carrington, dismissing all claims against Carrington.

On September 2, 2011, Feldman, Perry, and Appellees notified the District

Court that LEA had filed for bankruptcy on July 27, 2011 in the U.S. Bankruptcy

Court for the Eastern District of North Carolina (Bankruptcy Court), and the

2

Bankruptcy Court had automatically stayed the surviving claims of Feldman and Perry. *See id.* at 135.

On July 17, 2012, the Bankruptcy Court lifted the automatic stay, and ordered that Feldman and Perry could continue to pursue their claims against LEA, to the extent that insurance coverage for those claims existed, but could make no claims against the bankruptcy estate or trustee, and their recovery against LEA, if any, was limited to the proceeds of any applicable insurance. *See id.* at 147.

Appellees filed a motion for summary judgment on all claims against them on January 23, 2013. *See id.* at 152. After briefing, the District Court, on June 28, 2013, granted Appellees' motion for summary judgment on all of Feldman and Perry's surviving claims, and dismissed Appellees' counterclaims without prejudice. *See id.* at 4280.

Perry does not appeal the order granting summary judgment on his claims. Feldman appeals the order granting summary judgment with regard to his claim alleging whistleblower discrimination under SOX. *See id.* at 4329.

## <u>STATEMENT OF FACTS</u>

LEA manufactured and sold surveillance devices. *See JA* at 1552. It was founded by John Carrington, who also owned Sirchie Fingerprint Laboratories, Inc. *See id.* Feldman became President of LEA in approximately 2001 and remained its President and CEO through August 27, 2009. *See id.* at 1553. LEA, which had

been a division of Sirchie, became a separate publicly traded company in 2001,
trading on the over-the-counter market, and listed on the American Stock
Exchange in 2006. *See id.* at 1553, 2886-87, 3521-22.

In September 2006, Feldman hired Martin Perry to be LEA's Vice President
of Sales and Marketing. *See id.* at 1553. Perry was the second highest ranking
employee at LEA and reported directly to Feldman. Feldman and Perry were also
members of LEA's Board of Directors. *See id.*

## A. Carrington put Rand and Jordan on LEA's Board, and Rand chose Lindsay.

LEA's five-person Board was comprised of three "outside" Directors –
Anthony Rand, Joseph Jordan, and James Lindsay – who were chosen to represent
Carrington's interests; and Feldman and Perry, who actually led and managed
LEA, and put its growth and success ahead of Carrington's interests. *See id.* at
1573. Carrington put Rand and Jordan on the Board because of his long
association with them, and then Rand chose Lindsay, with whom Rand had a long
association. *See id.* at 3061-62.

## B. Carrington had to step down from control of LEA after he was convicted of a felony involving illegal exports in 2005; but he involved LEA in possibly illegal exports through SAFE Source, a company he secretly owned.

Carrington, LEA's founder and majority shareholder, made illegal exports
through Sirchie and pleaded guilty to a felony in 2005. *See id.* at 1553. The

4

federal government prohibited Carrington from making exports, directly or indirectly, for five years.  *See id.*  Because of the conviction, Carrington resigned from LEA's Board and ostensibly ceased to have any role in managing LEA's operations.  *See id.*

But Carrington then involved LEA in export sales through SAFE Source, a company he secretly owned.  *See id.* at 1554-55.  Because Carrington owned SAFE Source, exports by SAFE Source were likely illegal and LEA's involvement in the exports exposed LEA to potential liability.  *See id.*

**C.  In September 2007, Feldman learned that Carrington planned to sell LEA; after the sale announcement, the Outside Directors clashed with Feldman over their efforts to protect Carrington's interests.**

In September 2007, Feldman learned through a public announcement that Carrington intended to sell Sirchie, and LEA, to Raymond James.  *See id.* at 1553-54.  The Outside Directors became focused on protecting Carrington and ensuring the sale went through.  *See id.* at 1576-77.  Before the proposed sale, the Board generally voted unanimously and adopted Feldman's proposals.  *See id.* at 1573-74, 3577-80, 3844.  This changed when the Board focused on the proposed sale, though Feldman continued to expand the company and its profits.  *See id.* at 1573-74, 3544-45, 3577-80, 3844.

When Feldman learned that Carrington intended to sell Sirchie, and LEA, to Raymond James, Feldman was initially angry because Carrington had told him that

he did not intend to sell LEA, and that he would give Feldman a chance to purchase if he ever did try to sell it. *See id.* at 1573-74, 3577-80, 3844. But Feldman's anger dissipated and he got on with the business of running LEA. *See id.*

### D. After the sale announcement, the Outside Directors reversed their votes in favor of employment contracts for Feldman and Perry because they did not want anything to upset Carrington's sale of LEA.

In January 2006, LEA's Board had discussed an employment contract for Feldman, in connection with LEA's efforts to list on the American Stock Exchange. *See id.* at 2050, 3940-42. At an August 7, 2006 Board meeting, the Board approved a salary increase for Feldman to $175,000 and gave him a "car allowance." *See id.* at 3546-47, 3944-46. The Board also directed Eric Littman, LEA's counsel, to draft a revised proposed employment contract for Feldman. *See id.*

At a September 18, 2007 Board meeting, the Board discussed for the first time Raymond James's possible purchase of LEA. *See id.* at 3556-57, 3561-62. At the same September 18, 2007 Board meeting, the Board voted unanimously, in Rand's absence, to enter into employment agreements with Feldman and Perry. *See id.* At the next Board meeting, on November 1, 2007, Rand objected to the employment contracts that the Board had approved at the prior meeting because he thought that LEA should remain static while Carrington's sale to Raymond James

6

was pending. *See id.* at 3560-62. Lindsay and Jordan changed their positions, and voted with Rand to undo the employment contracts. *See id.* at 3562. This was the first time during Littman's association with LEA that the Board had not voted unanimously on a resolution or motion. *See id.* At the same November 1, 2007 Board meeting, Rand brought in Mark Finkelstein, a local attorney, to ensure that Carrington's interests were served. *See id.* at 2084-85, 2089-90, 2470-75, 3532-33. Finkelstein was introduced as Rand's attorney, though Rand later claimed that Finkelstein, at that time, represented all the Outside Directors. *See id.* at 2089-90, 3532-33.

### E. Finkelstein, on behalf of the Outside Directors, began drafting false minutes for LEA Board meetings; Feldman consistently objected.

Finkelstein began keeping minutes at this and subsequent Board meetings, even though that task will still being performed by Littman, on behalf of Perry as Secretary. *See id.* at 2046-47, 3216-20, 3525-27. Over the course of multiple subsequent meetings, Finkelstein and the Outside Directors used the minutes to misrepresent discussions and decisions. *See id.* at 1853-54. For some meetings, no version of the minutes was ever approved, leaving LEA with various inconsistent versions; for some other meetings, the Outside Directors used their majority to approve, over dissents by Feldman, minutes containing Finkelstein's misrepresentations. *See id.* at 2046-47, 3525-27.

**F. In late December 2007, and early 2008, Feldman reported to the Board that Carrington, through his secret ownership of SAFE Source, had involved LEA in possibly illegal exports; and Feldman suspected that the Outside Directors then leaked his disclosure to Carrington.**

In or around December 2007, Feldman for the first time learned of, and confirmed, Carrington's ownership of SAFE Source. *See id.* at 1849-53, 2478-80, 3000. He determined that LEA had to report its exports through SAFE Source to the federal government. *See id.* at 1554-1557. On December 27, 2007, Feldman told the Board about the issues caused by Carrington's ownership of SAFE Source, including LEA's potential liability. *See id.* at 1928-29, 2488-91.

Immediately after the December 27, 2007 meeting, Feldman saw Rand and Finkelstein meet with Carrington. *See id.* at 1862-66, 2491-94, 2549-51, 3593. He suspected that Rand and Finkelstein, on behalf of the Outside Directors, had informed Carrington of his report to the Board and his intention to report the same information to the federal government. *See id.* at 1561-62, 2156-62, 2549-51, 3448-49. The next day, or the day after, Feldman saw Wade Smith, the criminal attorney who represented Carrington in his prior conviction, meet with Carrington for several hours at the shared Sirchie-LEA facility. *See id.* at 2156-62, 2494-95, 3448-49, 3592-93.

**G. Feldman reported LEA's involvement with exports through SAFE Source to the federal government, and his report led to a criminal investigation; Feldman later asked the Outside Directors to affirm that they had not told Carrington about his disclosure; and the Outside Directors refused.**

In January 2008, Feldman sent a letter to, and then met with, Phillip Kuhn of the Bureau of Industry and Security (BIS), a division of the Department of Commerce. *See id.* at 1831-34, 1848-49, 1853-55. In the letter and subsequent meetings, Feldman reported Carrington's illegal and undisclosed ownership of SAFE Source, and its illegal export business conducted with LEA. *See id.* at 1831-32, 1843-47, 1928-29, 2466-67, 2549-51. Approximately one week after Feldman met with Kuhn for the first time, federal agents raided the headquarters of Sirchie and SAFE Source. *See id.* at 1554, 2781-83. Federal authorities began a criminal investigation. *See id.*

Because Feldman suspected that the Outside Directors had leaked information to Carrington, he decided, acting on the advice of Kuhn, that he could not provide the Outside Directors with details about his contacts with investigators. *See id.* at 3448-49, 3588-92, 3841-42. In early March 2008, Feldman requested that each of the Directors, and Finkelstein and Jorgensen, another attorney who represented LEA, sign a statement affirming that they had not shared any confidential information with Carrington. *See id.* at 2163-66, 3461-62. The Outside Directors and Finkelstein refused. *See id.* at 2163-66, 3461-63.

At the same time, Littman gave Kuhn's contact information to Finkelstein. *See id.* at 3257-59, 3715-18, 3838-39. Finkelstein telephoned Kuhn, and another person at the Commerce Department, several times. *See id.* at 3260-65. The Commerce agents told Finkelstein that they could not give him any information. *See id.* at 3270-71.

### H. Finkelstein presented invoices to LEA that Feldman refused to pay because he considered them fraudulent.

On March 13, 2008, the Outside Directors made Finkelstein LEA's corporate counsel, and fired Jorgensen from that role. *See id.* at 3162-63. Littman remained as securities counsel. In May 2008, Finkelstein presented bills to LEA for services he provided prior to March 13, 2008, even though Finkelstein's own billing system indicated Rand was his client when he provided the services. *See id.* at 1820-21, 3149-50. Feldman considered the bills fraudulent and refused to pay them. *See id.* at 1820-21, 1840-42, 2470-75, 3809-10.

### I. The Outside Directors did not perform their duties as Audit Committee members, and LEA had to report to the SEC in 2008 that it had violated its Audit Committee charter and the rules of the American Stock Exchange by failing to meet in 2007.

When LEA decided to list on the American Stock Exchange, it had to create an Audit Committee. *See id.* at 3882. LEA put Jordan, Lindsay, and Rand on the committee. Littman sent them instructions on what they had to do and "a corporate guidance document" that he had prepared. *See id.* at 3884-89, 3916-17. LEA's

10

Audit Committee was supposed to meet at least four times a year.  *See id.* at 3568-69.  Littman sent the financial information to the Outside Directors and then called them for feedback and tried to set up telephonic meetings.  *See id.* When Littman attempted to set up these meetings, they "generally didn't happen."  *See id.*

On February 5, 2008, Littman sent a four-page letter to Rand and Jordan in which he explained their "tremendous responsibilities" as members of the Audit Committee.  *See id.* at 1975-77, 3922-25.  In an email on March 25, 2008, Littman told Finkelstein that "despite what Mr. Rand and Mr. Jordan may tell you, they have been repeatedly told what their responsibilities as members of the Audit Committee are."  *See id.* at 1969-73, 3916-17.  Littman went on to recommend that both Rand and Jordan resign from the Board.  *See id.*

In 2008, LEA had to report to the SEC that its Audit Committee had failed to conduct any meetings in 2007 in violation of the Audit Committee charter and the rules of the American Stock Exchange.  *See id.* at 1966.

**J. After Feldman reported LEA's dealings with SAFE Source, the Outside Directors falsely claimed that Feldman failed to provide pre-meeting agendas and sufficient financial information; Feldman provided sufficient information and the Outside Directors did not review the information they received.**

During Littman's time at LEA, he sent out a notice with an agenda to Board members in advance of Board meetings.  *See id.* at 3540-41.  He sometimes spoke to Board members in advance of meetings, and they could have called Feldman or

Littman, but Littman "rarely got calls from them." *See id.*  The financials "were always available" and were "circulated ahead of time." *See id.*  No Board members ever complained to Littman about insufficient financial information with respect to quarterly and annual reporting. *See id.* at 3541-42.

In Board meetings, Directors were told that they could request and receive any information they needed by calling Feldman or Briggs. *See id.*  Briggs doubts that the Board reviewed the financial data presented to them; they did not seem conversant with the data. *See id.* at 2830-31.

LEA had no policies about what should be provided to the Board in advance of Board meetings. *See id.* at 2832-33.  LEA still has no written policy about what should be provided to the Board in advance of Board meetings. *See id.*  For a typical meeting, in his later role as LEA's President, Briggs provided a one page agenda. *See id.*  After LEA fired Feldman, Briggs provided the same financial data to the Audit Committee that he provided when Feldman was President and he was CFO in 2009. *See id.*  The distinction between Briggs's later one-page agendas and the prior one-page emails is more in style than in substance. *See id.* at 2836-37.  When Rand called a Board meeting, he did not provide an agenda. *See id.* at 2035-36.

**K. In 2008, Feldman moved LEA because it benefitted the company, and he had the authority to do it; and the Outside Directors opposed it only because they thought it would upset Carrington.**

In 2007, Feldman wanted to move LEA out of the building in Youngsville, North Carolina that LEA rented from and shared with Sirchie. *See id.* at 2687-88. No Board member saw or approved the lease for the Youngsville location prior to its execution. *See id.* at 3580-81. The Youngsville location was not well-suited for LEA's business. *See id.* at 2688. Feldman did not need the Board's prior approval to enter into a lease; he had the authority to enter into a lease or any contract except for the sale of the company's assets. *See id.* at 2616-17, 3799-3800.

At the November 1, 2007 Board meeting, Feldman discussed the reasons why it would benefit LEA to move. *See id.* at 2691-2704. Lindsay, in keeping with the Outside Directors' focus, said "let the new owner make the call" regarding relocating LEA. *See id.* at 3574-76, 3957. The Outside Directors "voiced concerns" about whether LEA might get sued by Sirchie if it moved, but did not specifically object to moving. *See id.* at 3576-77.

On February 5, 2008, Feldman notified Sirchie that LEA was terminating the lease between Sirchie and LEA for various reasons, including the Department of Commerce raid, that the lease was signed by Feldman under duress from Carrington, and that the lease was not in the best interests of LEA. *See id.* at 2498-2502. Feldman moved LEA from the Youngsville location (Hunter Place) in

13

March 2008 to a location in Raleigh (Discovery Drive) where LEA is currently located. LEA "saved a significant amount of money by moving." *See id.* at 2691-2704. The Youngsville facility was not a manufacturing facility, had no ability to secure its premises, and did not have a facility that LEA's newly acquired vehicle division could operate in. *See id.* The move saved LEA approximately $79,000 a year. *See id.* LEA never had to pay for leases at Youngsville and Discovery Drive at the same time. *See id.* at 2504-05. Sirchie never sued LEA to enforce the first lease. *See id.* at 2153, 3273.

**L. Before his firing, Feldman tried to negotiate a deal with Joseph and Barbara Wortley to avoid the consequences of an earlier deal, made by Carrington, with the Wortleys; and Feldman reported to LEA that Joe Wortley wanted the Outside Directors to resign.**

At a September 18, 2007 Board meeting, the Board discussed LEA's possible purchase of certain assets of Advanced Vehicle Systems from Barbara Wortley, through her husband Joseph Wortley. *See id.* at 3551-52, 4211-12. At the November 1, 2007 Board meeting, Feldman discussed how the AVS deal – i.e., the "second Wortley deal" – might resolve an existing suit against LEA that the Wortleys had filed resulting from the "first Wortley deal." *See id.* at 3552-56, 4214-19.

In the first Wortley deal, which was driven by Carrington when Carrington was still LEA's Chairman, LEA issued the Wortleys 2,400,000 shares of restricted common stock. *See id.* In that agreement, the Wortleys had a put option, which

14

meant LEA was obligated to purchase the stock back. *See id.* The Wortleys had sued LEA over whether they could exercise the put option. *See id.*

Later, in the second deal, LEA had the opportunity to buy the Wortleys' van division (AVS); Feldman, Perry, Briggs, and Littman decided it was a good idea and would end the litigation. *See id.* At the November 1, 2007 meeting, Rand had some questions about the second deal; Feldman and Briggs answered his questions, and the Board approved the second deal. *See id.* Thus, one result of the second Wortley deal, the AVS deal, was that an existing lawsuit by the Wortleys was dismissed. *See id.*

In 2009, the Wortleys were threatening to sue LEA over the second Wortley deal – the AVS deal; and LEA was trying to negotiate. *See id.* at 3598-3601. In approximately April 2009, Briggs, Feldman, Perry, and Littman met with Joe Wortley. *See id.* Littman described the meeting: "We came down there to try to make a compromise with him. I think part of the strategy was to pay him a certain amount up front and pay him over time." *See id.* During the meeting, Wortley voiced his dissatisfaction with the Outside Directors. *See id.* Wortley brought up the subject; Feldman and Littman did not raise it. *See id.*

Wortley said he wanted LEA's Outside Directors to resign. *See id.* at 2195-96, 3964. Wortley said Lindsay and Rand were not adding anything to the company. *See id.* at 3598-3601. He then said that he would be interested in either

15

having himself, or a representative of his stock position, on the Board. *See id.* In response, Feldman said the Outside Directors "could do more to help the company" and he too "wished they would do more." *See id.* But Feldman and Littman "weren't there to get into a personal discussion of the Board" and Feldman said "no more than that." *See id.*

When Feldman and Littman met with Wortley, LEA had sufficient assets to pay the Wortleys. *See id.* at 3603-05. They "were very close" to making a deal with Wortley that would have involved "giving him a couple hundred thousand dollars down and entering into an extended payment and maybe some more stock." *See id.* After meeting with the Wortleys, Feldman wrote to the Outside Directors and urged them to resign from the Board. *See id.* at 3754-55.

**M.  LEA reported record income and sales just before it fired Feldman; LEA purportedly fired Feldman because he had disparaged the Outside Directors to Wortley.**

In 2008 and 2009, Feldman and Perry secured, on behalf of LEA, federal contracts worth over $7,000,000. *See id.* at 2586-87, 2595-98, 2985, 2987. In the months just prior Feldman's firing, Feldman successfully led negotiations to secure a portion of a $225,000,000 contract with the Department of Homeland Security. *See id.* at 2599-2600. LEA reported record income and a 260% increase in sales only ten days before it fired Feldman. *See id.* at 2611-12.

According to LEA, the Outside Directors decided to fire Feldman at a Board meeting on August 27, 2009, because he had disparaged them to Joe Wortley; and because the Board had "lost confidence in him." *See id.* at 1641-43, 2195-96, 3088-90, 3753. According to LEA, LEA ultimately went bankrupt because of the second Wortley deal. *See id.* at 3055-56.

## SUMMARY OF THE ARGUMENT

The District Court erred by applying an erroneous standard of causation. Taken as a whole, the record establishes that Feldman's protected conduct under SOX was a contributing factor in LEA's decision to fire him. Although the District Court purported to apply the contributing factor standard proper to whistleblower retaliation claims under SOX, it applied a far more onerous standard, wrongly requiring Feldman to prove causation beyond a reasonable doubt, or wrongly requiring him to prove that his protected conduct was the sole cause of his termination. Feldman presented more than sufficient evidence of causation. He proffered several forms of direct and circumstantial evidence, including evidence of pretext. The District Court failed to properly weigh this strong evidence, in addition to applying an improperly onerous standard.

A contributing factor is any factor which, alone or in connection with other factors, **tends to affect *in any way*** the outcome of the decision. Feldman is not required to demonstrate that his protected activity was a "significant," motivating,"

17

"substantial," or "predominant" factor in LEA's decision to fire him. And for this reason, the fact that there was some animus between Feldman and the Outside Directors prior to his protected activity does not defeat causation. Feldman acknowledges that history of animus, while demonstrating that his protected conduct increased the animus and was a factor in his firing.

Antagonism towards protected conduct may manifest itself in many ways, and may be proved in many ways other than by evidence of temporal proximity. Proof of animus towards the employee and his protected activity is sufficient by itself to demonstrate discriminatory motive. Deviation from the employer's stated policy is also evidence of discriminatory motive, as is evidence of strong performance. Where temporal proximity is lacking, other evidence of retaliatory animus and evidence of recurring retaliatory animus during the intervening period can prove causation.

Feldman engaged in protected activity under SOX when he reported to LEA's Board, and to the federal government, that Carrington had involved LEA in possible felonies relating to SAFE Source's export business; when he objected to falsified Board meeting minutes regarding those reports and other LEA matters; when he objected to leaks from the Outside Directors to Carrington regarding his reports of SAFE Source's activities; and when he objected to, and refused to pay,

what he considered to be fraudulent invoices for legal services submitted by Finkelstein.

All of these instances of protected activity were met with retaliatory animus and acts of retaliation. The Outside Directors reacted to Feldman's disclosure that Carrington had involved LEA in possible felonies by leaking the information to Carrington and then hounding Feldman to reveal the details of his meetings with federal investigators. The Outside Directors reacted with further hostility to Feldman's request that they affirm that they had not leaked information to Carrington. The evidence permits an inference that the hostility engendered by Feldman's disclosure continued unabated through Feldman's firing.

Feldman's protected activity in objecting to falsified Board meeting minutes was both a source of retaliatory animus and a reflection of retaliatory animus. Several of the false minutes involved Feldman's disclosure about Carrington and SAFE Source, and his related concerns about the Outside Directors' leaks and refusal to affirm that they had not leaked. And this hostility continued unabated through Feldman's firing.

After Feldman's protected activity, LEA deviated from its policies and practices in several ways that further demonstrated retaliatory animus. The Outside Directors, for the first time, insisted that Feldman obtain their prior approval before leasing new manufacturing space, a business decision that

19

Feldman, as CEO, had made independently in the past.  The Outside Directors, for the first time, accused him of providing insufficient financial information, though he provided the same information that had been sufficient in the past – and the same information that his successor later provided after his firing.

And LEA fired Feldman even though his performance as the company's leader remained strong.  His insistence on moving the company reflected only good business judgment, not "insubordination," and the Outside Directors opposed it only because they did not want to upset Carrington.  Feldman's displeasure with the Outside Directors' inattention – including their failure to perform their Audit Committee duties – and his efforts to negotiate a deal with the Wortleys, demonstrated his commitment to LEA's success, and not "insubordination."  And, most importantly, under Feldman's leadership, LEA reported record income and a 260% increase in sales only ten days before it fired Feldman.

This evidence, taken as a whole and applied to the proper causation standard, shows that Feldman's protected conduct played a role in LEA's decision to fire him.

The District Court also erred in not analyzing whether LEA met its burden to produce "clear and convincing evidence" of its purported legitimate business reason.  Having erred in finding Feldman's protected conduct was not a contributing factor, the District Court erred again in making no effort to determine

20

whether LEA met its burden, under SOX, to demonstrate by clear and convincing evidence that it would have fired Feldman in the absence of his protected behavior. LEA did not meet this burden.

Finally, there can be no doubt that Feldman engaged in protected conduct under SOX. The District Court "assumed" that he had, in one or more ways, and any ambiguity caused by its imprecise "assumptions" must be resolved in favor of Feldman.

## STANDARD OF REVIEW

This Court reviews *de novo* the District Court's grant of Appellees' motion for summary judgment on Feldman's claim. *See Medical Waste Assocs. v. Mayor & City Council of Balt.*, 966 F.2d 148, 150 (4th Cir. 1992) ("The appellate standard for review of a summary judgment is *de novo*, applying the same standard as that applied by the district court.") (citing *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1127 (4th Cir. 1987)). Here, the standard requires summary judgment be granted only where "there is no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law." *See Medical Waste Assocs.*, 966 F.2d at 150 (citing *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc)).

Where the opponent of the motion for summary judgment has fulfilled his burden of bringing forward evidence that a reasonable fact finder could use to

justify a finding in his favor by a preponderance of the evidence, summary judgment cannot be granted. *See Motor Club of Am. Ins. Co. v. Hanifi*, 145 F.3d 170, 176 (4th Cir. 1998). Circumstantial evidence can be enough to generate a triable dispute. *See id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986)). All reasonable inferences should be drawn in the non-moving party's favor, and the court must not "make credibility determinations or weigh the evidence." *See Edell & Assoc., P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 436 (4th Cir. 2001).

## **ARGUMENT**

The Supreme Court and the Courts of Appeal have routinely held that whistleblower provisions must be given broad scope to accomplish their remedial purposes. *See, e.g., NLRB v. Scrivener*, 405 U.S. 117, 121-26 (1972); *English v. General Elec. Co.*, 496 U.S. 72, 82 (1990) (to "encourage" employees to report safety violations and protect their reporting activity); *Kansas Gas & Elec. Co. v. Brock*, 780 F.2d 1505, 1512 (10th Cir. 1985) ("narrow" or "hypertechnical" interpretations are to be avoided as undermining Congressional purposes.).

**I.    Feldman's protected conduct under SOX was a contributing factor; a contributing factor is any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision.**

A contributing factor is "any factor which, alone or in connection with other factors, **tends to affect *in any way*** the outcome of the decision." *See Halloum v. Intel Corp.*, 2003-SOX-7, at 18 (ALJ Mar. 4, 2004) (emphasis added) (citation omitted). Feldman should thus prevail merely by demonstrating that "retaliation for [his] protected conduct 'played some role' in the termination decision." *See* 49 U.S.C. § 42121(b)(2)(B)(iii). He need not demonstrate that his protected activity was a "significant," "motivating," "substantial," or "predominant" factor in an employment action. *See Addis v. Dep't of Labor*, No. 08-1009, slip op. at 10-11 (7th Cir. July 30, 2009) (contributing factor is a lower hurdle in the whistleblowing context than in other employment statutes and requires less than substantial or motivating factor standards).

**II.    A contributing factor may be demonstrated by various types of direct and circumstantial evidence; temporal proximity is not required.**

The inference of discriminatory intent can be reached inductively. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000). Antagonism towards a complainant's protected conduct may manifest itself in many ways. *See Timmons v. Mattingly Testing Servs.,* 95-ERA-40 at 5-6 (ARB June 21, 1996) (citations omitted). Proof of animus towards the employee and his protected activity is sufficient <u>by itself</u> to demonstrate discriminatory motive. *See, e.g.,*

23

*Pillow v. Bechtel Constr., Inc.*, 87-ERA-35, at 13 (July 19, 1993) (emphasis added).

LEA's resentment of Feldman for his protected disclosure constitutes direct evidence of discrimination. At a minimum, it is strong circumstantial evidence of retaliatory animus, which coupled with other circumstantial evidence of retaliation, meets the contributing factor standard. The Outside Directors reacted to Feldman's disclosure that Carrington had involved LEA in possible felonies by leaking the information to Carrington and then hounding Feldman to reveal the details of his meetings with federal investigators. The Outside Directors reacted with further hostility to Feldman's request that they affirm that they had not leaked information to Carrington. The evidence permits an inference that the hostility engendered by Feldman's disclosure continued unabated through Feldman's firing.

Feldman's protected activity in objecting to falsified Board meeting minutes was both a source of retaliatory animus and a reflection of retaliatory animus. Several of the false minutes involved Feldman's disclosure about Carrington and SAFE Source, and his related concerns about the Outside Directors' leaks and refusal to affirm that they had not leaked. And this hostility continued unabated through Feldman's firing.

24

### A. Deviations from policy are evidence of discriminatory motive.

Deviation from the employer's stated policy is evidence of discriminatory motive. *See*, *e.g.*, *Wells v. Kansas Gas & Elec. Co.,* 83-ERA-12 at 17 (ALJ Feb. 27, 1984). Inconsistent application of company policies or procedures evidences retaliatory animus. *See Nix v. NEHI-RC Bottling Co., Inc.,* 84-STA-1, at 12 (Sec'y July 13, 1984) ("inconsistent application of company politics has been held to be evidence of retaliatory motive"). Divergence from internal company protocols is evidence of causation. *See McClam v. Norfolk Police Dept*., 877 F.Supp. 277, 282 (E.D.V.A. 1995); *see also Lee*, 102 F. Supp. 2d at 1277 (indirect evidence of retaliation can include an employer's violation of standard internal protocol and procedures).

After Feldman's protected activity, LEA deviated from its policies and practices in several ways that further demonstrated retaliatory animus. The Outside Directors, for the first time, insisted that Feldman obtain their prior approval before leasing new manufacturing space, a business decision that Feldman, as CEO, had made independently in the past. The Outside Directors, for the first time, accused him of providing insufficient financial information, though he provided the same information that had been sufficient in the past – and the same information that his successor later provided after his firing. And the falsified minutes, while the subject of protected conduct by Feldman, also

constituted deviations from policies and standard internal protocols and

procedures.

### B. A record of strong performance, and a record of criticism, may provide evidence of discriminatory motive.

Evidence of discriminatory motive includes the disproportionate harshness

of a penalty imposed on an employee with an otherwise excellent work record and

no prior disciplinary offenses. *See, e.g., Overall v. TVA*, 97-ERA-53, at 16-17

(ARB April 30, 2001) (finding retaliatory motive where employer gave employee

positive evaluations until he engaged in protected conduct); *Jayco v. Ohio Envtl.*

*Prot. Agency,* 1999-CAA-5 at 88, 91 (ALJ Oct. 2, 2000) (finding pretext in the

discipline of an employee with a six-year record of that is free of discipline).

Indirect evidence of retaliation can include criticism and differential

treatment. *See Lee v. N.M. State Univ. Bd. of Regents*, 102 F. Supp. 2d 1265, 1277

(D.N.M. 2000). Noting deficiencies in job performance can be evidence of a

pattern of retaliation. *See Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 326, 329 (10th

Cir. 1996).

LEA fired Feldman even though his performance as the company's leader

remained strong. His insistence on moving the company reflected only good

business judgment, not "insubordination," and the Outside Directors opposed it

only because they did not want to upset Carrington. Feldman's displeasure with

the Outside Directors' inattention – including their failure to perform their Audit

Committee duties – and his efforts to negotiate a deal with the Wortleys, demonstrated his commitment to LEA's success, and not "insubordination." And, most importantly, under Feldman's leadership, LEA reported record income and a 260% increase in sales only ten days before it fired Feldman.

## C. Other evidence of retaliatory animus suffices where temporal proximity is lacking.

A sophisticated employer may not precipitously fire a skilled or professional employee who cannot easily be replaced, or who is engaged in significant on-going projects, but bide its time before retaliating. *See Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173,178 (3d Cir. 1997). Where temporal proximity is lacking, courts may look to the intervening period for other evidence of retaliatory animus and evidence of recurring retaliatory animus during the intervening period can be sufficient. *See EEOC v. Mental Health Auth. of St. Mary's, Inc.*, 2008 WL 53254, at *8 (D. Md. 2008); *see Jackson v. RKO Bottlers of Toledo, Inc.,* 743 F.2d 370, 377 n. 4 (6th Cir. 1984) (reversing judgment for defendant and remanding for further consideration where discharge occurred nearly one and one-half years after complaint but pattern of retaliation allegedly began soon after complaint was filed); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 921 (3d Cir. 1997) ("plaintiff can establish link between his or her protected behavior and subsequent discharge if the employer engaged in pattern of antagonism in the intervening period.").

Very little evidence of a causal connection is required, and temporal proximity is not required. *See Mental Health Auth. of St. Mary's, Inc.*, 2008 WL 53254, at *8 (emphasis added). Other evidence of retaliatory animus may satisfy the "very little" that is needed to plead causation. *See id.*

The District Court's only analysis of the contributing factor standard focused on temporal proximity. The District Court held that a 16-month gap between Feldman's protected activity and his firing "is simply too attenuated to establish the causation necessary to sustain" his SOX claim. *See* JA at 4321. It also dismissed Feldman's strong evidence of the Outside Directors' recurring retaliatory animus, simply because some animus between Feldman and the Outside Directors had developed before Feldman's first protected activity. *See id.* at 4322. The District Court wrongly claims that because there was animus prior to protected activity, "[t]his refutes [Feldman's] contention that LEA had a retaliatory motive in taking adverse action against [him]." *See id.* at 4322-23. By making this claim, the District Court demonstrates that it has misapplied the contributing factor standard.

Finally, the District Court misapplies the law when it finds a "legitimate intervening event" in the Outside Directors' pretextual reaction to Feldman's Wortley negotiations. The case cited by the District Court discusses how "a 'legitimate intervening event' may defeat any causal inference that might be

28

premised upon temporal proximity." *See id.* at 4323, citing *Sussberg v. K-Mart Holding Corp.*, 463 F. Supp. 2d 704, 713 (E.D. Mich. 2006). But Feldman has not premised a causal inference upon temporal proximity. He demonstrates a causal inference by other strong evidence independent of temporal proximity.

**III.    LEA failed to demonstrate by clear and convincing evidence that it would have taken the same adverse action in the absence of Feldman's protected conduct.**

Under the SOX framework, once a plaintiff in federal court has shown by a preponderance of the evidence that his protected activity was a contributing factor, the employer must demonstrate by clear and convincing evidence that it would have taken the same adverse action in the absence of the protected behavior. *See Collins v. Beazer Homes USA, Inc.*, 334 F. Supp. 2d 1365, 1376 (N.D. Ga. 2004); *see also* 29 C.F.R. § 1980.104(c). Clear and convincing evidence is "[e]vidence indicating that the thing to be proved is highly probable or reasonably certain." *See Peck v. Safe Air Int'l*, Inc., ARB No. 02-028 at 6, ALJ No. 2001-AIR-3 (ARB Jan. 30, 2004) (citing BLACK'S LAW DICTIONARY 1201 at 577 (7th ed. 1999)). This standard of evidence is a higher burden than "preponderance of the evidence," but less than "beyond a reasonable doubt." *See Duprey v. Fla. Power & Light Co.*, 2000- ERA-5 at 4 (ALJ July 13, 2000), *aff'd*, (ARB Feb. 27, 2003) (citing *Grogan v. Garner*, 498 U.S. 279 (1991)). The SOX evidentiary framework is thus "an analysis different from that of the general body of employment

29

discrimination law." *See Collins*, 334 F. Supp. 2d at 1374, n.11.

LEA did not meet its burden to produce "clear and convincing evidence" of its purported legitimate business reason. The District Court analyzed LEA's evidence of its purported legitimate business reason only in the context of Feldman's claims under the Americans with Disabilities Act. The District Court erred in not analyzing LEA's proffered legitimate business reason, or Feldman's evidence of pretext, within the proper SOX evidentiary framework.

As evidence of Feldman's "insubordination," the District Court pointed to two things: (1) he moved the company in 2008; and (2) he made comments to the Wortleys about the Outside Directors' lack of involvement in LEA's operations and then asked the Outside Directors to resign in order to fashion a deal with the Wortleys. *See* JA at 4300. More broadly, the District Court discussed these issues in the context of "a history of conflict" between Feldman and the Outside Directors. *See id.* The District Court was untroubled by the lack of temporal proximity between Feldman's move of the company and his firing, well over a year later. It nonetheless credited the move as a factor in LEA's decision to fire Feldman. *See id.* And it assessed Feldman's Wortley-related actions as part of "a history of conflict," and not in isolation. *See id.*

Here, the District Court gives LEA the benefit of all possible factual inferences regardless of temporal proximity. It applies the kind of lenient

"contributing factor" analysis to LEA's legitimate business reason (i.e., putting all evidence of "insubordination" by Feldman in a "historical" context free of any requirement of temporal proximity) that it should have applied to causation.

The District Court failed to give any weight to Feldman's strong performance record. *See id.* at 4301 (noting "Feldman attempts to show that he was meeting or actually exceeding LEA's performance expectations" without discussing his evidence). It does not even discuss the pretextual implications of LEA firing Feldman immediately after the company produced record earnings.

The District Court correctly notes that "it is the perception of the decision maker which is relevant" in the context of insubordination, <u>if insubordination "truly was the reason for the plaintiff's termination.</u>" *See id.* (citing *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (emphasis added). But it fails to properly credit – or even analyze – Feldman's strong evidence of pretext in the SOX context. *See id.* (stating that "there is simply no evidence in the record from which a rational fact finder could conclude that LEA's decision to terminate Feldman was a pretext designed to mask <u>disability discrimination</u>") (emphasis added). As discussed above in demonstrating that Feldman's protected conduct was a contributing factor to his firing, Feldman presented strong evidence of pretext.

**IV.    Feldman engaged in protected conduct under SOX; any doubt caused by the District Court's "assumptions" must be resolved in favor of Feldman.**

In 2011, the Department of Labor Administrative Review Board (ARB) held that SOX protected activity is not limited to reporting fraud against shareholders. *See Sylvester v. Parexel,* 2011 WL 2517148 at *15-18 (May 25, 2011). A reasonable belief about a violation of any SEC regulation or rule embraces situations "in which the violation, if committed, is completely devoid of any type of fraud" – but is nonetheless protected. *See id.* at 17. An employee may also engage in protected activity under Section 806 even if he "fails to allege, prove, or approximate specific elements of fraud" and "fails to allege or prove materiality, scienter, reliance, economic loss, or loss causation." *See id.* at 18.

**A. Under *Sylvester*, which should be accorded *Chevron* deference, protected activity does not require explicit references to specific violations.**

*Sylvester* also overruled *Platone v. Dep't of Labor,* 548 F.3d 322 (4th Cir. 2008). In *Sylvester*, the ARB held that the requirement announced in *Platone* that for a communication to be protected, it must "definitively and specifically" relate to shareholder fraud or one of the statutes or rules listed in § 1514A was not consistent with the purpose or language of § 1514A. *See Sylvester,* 2011 WL 2165854, at *14–15. Instead, the ARB noted, the complainant need only show that (1) he had a subjective belief that the complained-of conduct constitutes

32

shareholder fraud or a violation of one of the statutes or rules listed in § 1514A, and (2) the belief was objectively reasonable. *See id.*

The Supreme Court, this Court, and other Courts of Appeal afford deference to the Department of Labor's interpretation of SOX as expressed in formal regulations under *Chevron U.S.A.*, *Inc. v. Natural Resources Defense Council*, *Inc.*, 467 U.S. 837, 844 (1984). ARB adjudications such as *Sylvester* should be afforded *Chevron* deference.

The Fourth Circuit has not reviewed its SOX precedents in light of *Sylvester*. But the Fourth Circuit has held, in *Welch v. Chao*, 536 F.3d 269, 275-76 (4th Cir. 2008), that it affords *Chevron* deference to the ARB's interpretation of § 1514A of the Sarbanes–Oxley Act. Other circuits, including the Third and the Tenth, that have reviewed their SOX precedents in light of *Sylvester* have deferred to the ARB's more expansive interpretation of protected activity. *See, e.g., Wiest v. Lynch*, 710 F.3d 121, 129-31 (3d Cir. 2013) (affording *Chevron* deference to *Sylvester* and thus holding an employee complaint need not specifically relate to shareholder fraud to be actionable under SOX, and rejecting *Platone's* "definitive and specific" standard).

The District Court <u>assumed</u> that Feldman engaged in protected activity under SOX when he reported to LEA's Board, and to the federal government, that Carrington had involved LEA in possible felonies relating to SAFE Source's

33

export business; when he objected to falsified Board meeting minutes regarding those reports and other LEA matters; when he objected to leaks from the Outside Directors to Carrington regarding his reports of SAFE Source's activities; and when he objected to, and refused to pay, what he considered to be fraudulent invoices for legal services submitted by Finkelstein.  *See* JA at 4315-16.[1]  Without further analysis, the District Court said the following: "it is unclear whether all of the alleged protected activities are protected by SOX . . . [but] the court assumes without deciding that all of these activities meet the definite and specific standard and that they fall within one or more of the six enumerated categories listed in Section 1514A of SOX."  *See id.* at 4315.  Because it "assume[d] without deciding" that Feldman had engaged in the various forms of SOX protected activity, the District Court held that it "need not now resolve the issue of whether the recent [*Sylvester*] decision by the ARB affects Fourth Circuit precedent."  *See id.*

Feldman does not now ask this Court to resolve the issue of *Sylvester's* impact on Fourth Circuit precedent.  But Feldman does insist that any ambiguity

---

[1]     The District Court also found that Feldman did not engage in protected conduct when he reported suspected insider trading to a federal agent prior to his firing, because he lacked an objectively reasonable belief that a violation had occurred and because he did not show that LEA knew about his report of suspected insider trading.  *See id.* at 4316-17.  Feldman does not appeal the District Court's finding regarding this one category of alleged protected conduct.

34

caused by the District Court's "assumptions" regarding protected conduct must be resolved in favor of Feldman – he did, in fact, engage in the protected conduct "assumed" by the District Court.

## CONCLUSION

The District Court erred by applying an erroneous standard of causation. Taken as a whole, the record establishes that Feldman's protected conduct under SOX was a contributing factor in LEA's decision to fire him.  The District Court failed to properly weigh this strong evidence, in addition to applying an improperly onerous standard.

All of Feldman's instances of protected activity were met with retaliatory animus and acts of retaliation.  After Feldman's protected activity, LEA deviated from its policies and practices in several ways that further demonstrated retaliatory animus.  And LEA fired Feldman even though his performance as the company's leader remained strong – LEA reported record income and a 260% increase in sales only ten days before it fired Feldman.

The District Court also erred in not analyzing whether LEA met its burden to produce "clear and convincing evidence" of its purported legitimate business reason.  LEA did not meet this burden.  Finally, there can be no doubt that Feldman engaged in protected conduct under SOX.  The District Court "assumed"

that he had, in one or more ways, and any ambiguity caused by the District Court's "assumptions" regarding protected conduct must be resolved in favor of Feldman.

Feldman respectfully requests that the decision of the District Court granting summary judgment with regard to his claim of whistleblower discrimination under SOX be reversed and that the case be remanded for trial.

## **REQUEST FOR ORAL ARGUMENT**

Appellant respectfully requests that this Court schedule oral argument on his appeal.  Oral argument is appropriate because the issues presented are complex.

Respectfully submitted,

/s/ John T. Harrington
R. Scott Oswald
John T. Harrington
The Employment Law Group, P.C.
888 17th Street, N.W., Suite 900
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
tharrington@employmentlawgroup.com

Michael C. Byrne
Law Offices of Michael C. Byrne, PC
Wachovia Capitol Center, Suite 1130
150 Fayetteville Street
Raleigh, NC 27601
Phone (919) 865-2572
michael@mcbyrnelaw.com
Local Civil Rule 83.1 Counsel
NC Bar #22690

*Counsel for Appellant Paul H. Feldman*

36

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

> [ X ] this brief contains [***8,217***] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

> [   ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2000*] in [*14pt Times New Roman*]; *or*

> [   ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated:  <u>09/04/2013</u>                    /s/ John T. Harrington
                                               Attorney for Appellant

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 4th day of September, 2013, I caused this Brief

of Appellant to be filed electronically with the Clerk of the Court using the

CM/ECF System, which will send notice of such filing to the following registered

CM/ECF users:

> Helen F. Hiser
> Amy Y. Jenkins
> MCANGUS, GOUDELOCK & COURIE, LLC
> Post Office Box 650007
> Mount Pleasant, South Carolina 29465
> (843) 567-2930
>
> *Counsel for Appellees*

I further certify that on this 4th day of September, 2013, I caused the

required number of bound copies of the Brief of Appellant and Joint Appendix to

be hand filed with the Clerk of the Court.

/s/ John T. Harrington
Attorney for Appellant